**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | | |
| Plaintiff, | | |
| v. | | *No. 07 C 4483* <br> *Judge James B. Zagel* |
| FISHER, et al., | | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

In a civil enforcement action, the United States Securities and Exchange Commission (the "Commission") sued three former officers of the gas utility company Nicor, Inc. for violations of the securities laws incident to a purportedly massive financial accounting fraud. The claims come under the Securities Exchange Act and rules promulgated thereunder. Jurisdiction and venue are uncontroversial.

Two of the three Defendants, Kathleen Halloran and George Behrens, now move for summary judgment. (Defendant Thomas Fisher has settled his case). The motion's primary argument is that the SEC has failed to uncover sufficient evidence of the requisite mental state (*scienter* for some claims, negligence for others). I find that the Commission has produced sufficient evidence to warrant a trial with regard to the mental state requirements, so the motion on that basis is

DENIED.

I do find, however, that the Commission has not produced material misleading statements relevant to its claim for civil penalties. Further, I find that the Commission has failed to produce sufficient evidence regarding the need for the remedies of injunction and an officer/director bar against Defendants. Thus, where the motion relates to those remedies, the motion is GRANTED.

The case therefore proceeds on all counts, but only for the equitable remedy of disgorgement of profits.

## FACTS

Recounted with all reasonable inferences in favor of the Commission, the undisputed facts of the case are as follows.

Throughout the time relative to the allegations, Nicor Inc. was a gas utility holding company headquartered in Naperville, Illinois. Its common stock was registered pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange. Through its subsidiary, Northern Illinois Gas Co. ("Nicor Gas"), Nicor provides natural gas service to much of northern Illinois. Nicor Gas, as a public utility, is regulated by the Illinois Commerce Commission ("ICC").

Defendant Kathleen Halloran, age 59, received a bachelor's degree in accounting from Lewis University in 1974 and a Master's in Business

Administration degree from Northern Illinois University in 1979. She is an unlicensed CPA, who took and passed the CPA exam but never practiced as such. Halloran worked for Nicor from 1974 until she retired in August, 2004. Halloran has not worked since her retirement. From May 1999 through November 2003, Halloran was Executive Vice President Finance and Administration. Halloran was the Chief or Principal Financial Officer in 1999 and was both the Chief or Principal Financial Officer and the Chief or Principal Accounting Officer from 2000 through at least 2002.

Defendant George Behrens, age 56, received a bachelor's degree in accounting in1976, a Master's in Business Administration degree in finance in 1982, and is an unlicensed certified public accountant. Behrens was hired by Northern Illinois Gas Co. in 1996 and served in a variety of capacities until he resigned in June 2006. Behrens directly reported to Halloran from at least November 1, 1999 through at least March 1, 2003. Behrens was Vice President and Controller for Nicor and Nicor Gas from 1998 through 1999, Vice President Administration for Nicor and Nicor Gas from 1999 through 2000, and Vice President Administration and Treasurer for Nicor and Nicor Gas from 2000 through at least March 1, 2003.

*Quarterly and Annual Financial Statements*

For each fiscal year ending in December 1999, December 2000 and December 2001, Nicor publicly filed Form 10-Ks with the SEC that included unqualified opinions on Nicor's financial statements from its independent outside auditors at the Arthur Andersen accounting firm. Nicor also filed the corresponding 10-Q quarterly forms in that time period.

In March 2003, Nicor restated its financial statements for 1999, 2000, and 2001, as well as its quarterly financial statements for the first three quarters of 2000, 2001 and 2002.

Nicor filed a Form 8-K signed by Halloran and filed on August 14, 2002, certifying, pursuant to a Commission Order dated June 27, 2002, that Nicor's 2001 annual and quarterly filings with the Commission contained no untrue statement or omission of material fact. Nicor filed on the same day a Form 10-Q for the second quarter of 2002 which included previously issued financial statements of Nicor for earlier periods, which earlier financials, the SEC alleges, contained material errors and were ratified.

Prior to issuing the restatements, on July 18 and July 19, 2002, Nicor issued press releases disclosing that allegations of errors or improprieties related to its accounting under its performance based rate program ("PBR") had occurred. Through these two publicly issued press releases, Nicor advised that it was

possible that "the company will have to restate some of its prior financial results or take a charge against further earnings, although the extent of or need for any such restatement or charge is not currently known." Nicor also announced that it had formed a Special Committee of the Board of Directors to conduct an inquiry and that the Special Committee, in turn, had retained former U.S. Attorney Scott Lassar to perform an independent investigation.

*"Last-In, First Out" Inventory Valuation*

Nicor valued its natural gas inventory using the last-in, first-out ("LIFO") cost method. LIFO is an inventory costing method that assumes for accounting purposes that the last goods purchased or manufactured are the first ones sold, irrespective of the actual physical flow of goods. In periods of rising prices, LIFO usually produces a lower inventory valuation on an entity's balance sheet – or "book value" – than results from using a first-in, first-out ("FIFO") method, which assumes that the first goods purchased or manufactured are the first ones sold.

LIFO requires that inventory quantity increases in a given year be priced at current replacement cost, which usually approximates current market prices. When there is a quantity increase from the prior year end, a new LIFO layer is created. The new LIFO layer, priced at current replacement cost, is then added onto the layers created in past years to arrive at the total year-end inventory valuation.

Conversely, should year-end quantities decrease from the prior year – i.e., the company experiences a "LIFO decrement" – the reduction is accounted for by eliminating or reducing some or all of the most recent inventory layer or layers to determine the year-end inventory valuation. Depending on the size of the inventory reductions and the carrying values of the remaining layers, LIFO decrements frequently result in a significant mismatching of current revenues versus the amount reported as cost of goods sold, with the latter reflecting quantities carried at the lower costs prevailing in prior years rather than current replacement costs.

Under the LIFO method, as of December 31, 1998, Nicor's inventory consisted of gas "layers" priced at historical prices from 1954 to 1996. (Id. ¶ 19; SEC Ex. 65.) The most recent layers from 1996 and 1984, internally known as Nicor as the "high-cost" layers, were carried at costs of $3.23 and $2.88 per MMbtu (a measure of gas volume) respectively. These two layers represented about 78% of the total LIFO dollar valuation at December 31, 1998 although they were only about 26% of the gas volume in inventory at that date. (Id.) The remaining 74% of the gas volume at December 31, 1998 consisted of so-called "low-cost" LIFO layers dating from 1973 back to 1954 and were carried at costs per unit of gas ranging from $.45 to $.19.

The combination of Nicor's LIFO accounting policy and a substantial

increase in gas market prices in the years following gas industry deregulation meant that, by the late 1990s, the market value (or replacement cost) of Nicor's inventory of gas in storage far exceeded the book value at which Nicor carried the inventory. As of December 31, 1999, Nicor was carrying on its books inventory that had "cost" only $31 million but that had a current market value of $203 million, a difference of approximately $172 million.

The $172 million difference represented the unrealized "value" that Nicor was seeking to capture when it developed its PBR proposal, discussed below. This $172 million dollar value is at the heart of the allegations in the Commission's theory of the alleged fraud.

*Nicor Forms an "Inventory Value Team"*

Under its traditional regulatory rate plan, PGA, Nicor was required to pass its cost of gas directly to customers without a markup – i.e., if lower cost layers of gas were used to supply customers, then customers would pay less for the gas. This pass-through was accomplished by means of the purchased gas adjustment ("PGA"). In addition to the cost of gas, other recoverable costs are defined under the Illinois Administrative Code and include costs to store natural gas, costs to transport natural gas through natural gas transmission pipelines, and other out-of-pocket costs related to the purchase and transportation of natural gas. Utilities

cannot recover costs through the PGA other than those specifically defined as recoverable gas costs.

In 1998, Nicor was facing a situation in which and industry phenomenon known as "unbundling," along with other developments, was expected to cause Nicor to liquidate some or all of its low-cost LIFO inventory. Under the company's traditional rate mechanism then in place, 100% of the previously unrealized value of any such liquidated LIFO inventory would have gone to Nicor's ratepayers.

In early 1998, Nicor assembled an Inventory Value Team ("IVT") in order to capture the value of the LIFO layers for the company. Defendant Behrens had some role in the formation of the IVT, though the extent of that role is disputed. (Defendant Hallaron was not a member of the IVT). According to the testimony of Jeffrey Metz, Nicor's controller and a direct subordinate of Defendant Behrens, Behrens "told" Metz to form the IVT. Metz stated that the purpose of the IVT "was to look at different ways of monetizing the LIFO inventory value." According to documents prepared by the IVT, the team was formed to explore Nicor's "best strategy to capture the value of the LIFO layers" and to "evaluate stockholder capture of excess market value."

Later in 1998, the IVT prepared a report recommending that Nicor file and

implement a Gas Rate Performance Plan (or PBR) in order to capture the value of Nicor's LIFO inventory for the company. According to the Inventory Value Team Report, "[d]ue to [industry developments] it is likely that we will liquidate some of our LIFO inventory and reduce or eliminate the low priced LIFO layers, thus 'releasing' some of this value." The report acknowledged that under Nicor's traditional rate program, and absent a PBR program, the full economic value associated with the liquidation of Nicor's low cost LIFO layers would pass through the PGA for the benefit of ratepayers: "Under our current rate structure, book value of gas inventory reductions would be included in the PGA."

Under the "Recommendation" section, the Inventory Value Team Report noted that the economic value associated with the low-cost LIFO inventory was likely to begin accruing to ratepayers via inventory liquidation spurred by the trend toward unbundling. In relevant part, the report stated, "[t]here is a critical need to act quickly with the inventory value issue since the pace of unbundling may cause us to start withdrawing the low priced gas in two or three years."

The IVT explored various "Ways to Capture the LIFO Inventory Value," including the elimination of the PGA, conversion to a fixed-price PGA, and the PBR. After exploring the pros and cons of each approach, the IVT, as reflected in the report, concluded that implementing a performance based rate plan was "the

recommended method for the Company to capture the value from the LIFO layers."

*Nicor's Change from the "PGA" Rate Plan to a "PBR" Rate Plan*

Performance-based ratemaking is an alternative to traditional utility ratemaking. The goal of performance-based ratemaking, as generally understood in the utility industry, is to provide ratepayers with benefits that would not be achieved under traditional regulation, typically by allowing utilities the ability to profit from outperforming certain benchmarks established by regulators. In the case of the PBR proposed, and ultimately adopted by Nicor, to the extent that actual gas costs were lower than the benchmark, then the savings were shared between Nicor and its ratepayer customers. To the extent that actual costs were higher than the benchmark, then the losses likewise were shared between Nicor and the ratepayers and the utility.

On November 20, 1998, the IVT presented its report and findings to Defendants Halloran and Behrens, as well as other senior Nicor executives. The report was distributed to everyone, who was invited to the meeting including Defendants. During the meeting, the IVT discussed the reasons why it had concluded that the PBR plan was the recommended method to capture the value of

the LIFO layers. Among the important benefits of a PBR plan that were discussed was the fact that the benefit Nicor was expecting to reap from the LIFO inventory liquidations was "not explicit."

On August 4, 2000, Nicor controller Jeffrey Metz wrote a memorandum, which was shared with Defendants, noting that on an interim basis, Nicor "will need to be careful to not highlight the LIFO benefit. In the actual year-end PBR computation, the LIFO benefit will be very difficult to recognize. It may be more transparent on an interim basis."

On February 16, 1999, the Financial Policy Committee, of which Halloran and Behrens were members, met. The IVT presented its findings. The Financial Policy Committee then authorized their subordinates to prepare and file with the ICC an application for approval of a PBR plan. After the meeting Behrens told the company's controller Metz to go ahead and proceed with the PBR plan.

In March 1999, Nicor petitioned the ICC to approve its PBR. Nicor cited three objectives in proposing the GCPP: (1) to provide an economic incentive for Nicor to improve its performance in providing the best gas costs for customers; (2) to establish a reasonable balance between risk and reward for Nicor; and (3) to lower regulatory costs by eliminating retrospective prudence reviews. Nicor also explained that the Company's proposal "responds to changing gas supply markets

brought about by the restructuring of the natural gas industry" and the resultant "opportunities to aggressively pursue cost minimization through innovative, nontraditional means." The rationales for the PBR presented by Nicor in its petition and its supporting testimony, and the reasons cited by the ICC in approving a modified version of Nicor's proposed PBR reflect the reasons, as widely understood in the utility industry at the time, that utilities and regulators pursued performance-based ratemaking.

Nicor was represented by the law firm of Mayer, Brown & Platt in presenting the proposed PBR to the ICC. Mayer Brown attorney Stephen Mattson reviewed the testimony submitted by Nicor witnesses, advised Nicor's witnesses, drafted briefs submitted to the ICC, and argued orally before the ICC on Nicor's behalf. Neither Halloran nor Behrens submitted testimony or made statements to the ICC in connection with Nicor's filing.

In approving the PBR, the ICC agreed that the deregulation of the natural gas industry had created opportunities for gas cost reductions through "innovative, non-traditional means." As required by the authorizing Illinois statute and in keeping with the basic principles of incentive-based ratemaking, the ICC approved the modified PBR based upon anticipated benefits for Nicor's customers. The ICC found that the GCPP was "likely to result in rates lower than those under

traditional regulation" and that economic incentives such as those created by the GCPP "promote innovation, encourage efficiency, lower regulatory costs and encourage utilities to respond to new market challenges." The ICC concluded that "these benefits are substantial and identifiable benefits that will be realized by customers under the program that would not be realized in its absence."

It is disputed whether or not the liquidation of the LIFO layers of gas inventory was appropriately disclosed to the ICC for its consideration of Nicor's PBR plan. More specifically, it is undisputed that Nicor had low-cost LIFO inventory and that it showed changes in that inventory in certain regulatory filings with the Federal Energy Regulatory Commission and the ICC.

On January 1, 2000, Nicor's PBR plan went into effect. Under the PBR plan, Nicor's savings and losses relative to the market-sensitive benchmark were to be shared equally between the company and customers. Nicor's PBR Plan was subject to further review after two years by the ICC.

On August 4, 2000, Metz wrote a memorandum, which was shared with Behrens and Halloran, again noting that on an interim basis, Nicor "will need to be careful to not highlight the LIFO benefit. In the actual year-end PBR computation, the LIFO benefit will be very difficult to recognize. It may be more transparent on an interim basis."

Once in effect, the Gas Supply Department at Nicor (a separate department from Defendants) was involved in developing and implementing strategies to perform under the PBR. It is disputed whether or not that department was solely responsible for all aspects of the PBR. For instance, in meetings that occurred while the PBR was in effect, participants discussed PBR "buckets reports" or PBR Scorecards, which showed Nicor's performance relative to the PBR with and without LIFO decrements, the use of storage prefills, and losses associated with gas supply transactions, such as with the Aquila "weather insurance" transaction in 2001. Among those participants were Defendants Halloran and Behrens.

Nicor thereafter engaged in certain transactions designed to allow it to access lower-cost LIFO layers while maintaining a sufficient amount of gas to facilitate operations.

The LIFO inventory decrements were made known to Nicor's on-site accountants or disclosed in public filings. The LIFO inventory's impact on earnings was not.

*"Delivered Gas Storage" Transactions*

DSS is a delivered storage service provided by Natural Gas Pipeline Company of America. The gas supplied under this arrangement was accounted for as inventory by Nicor. On December 10, 1999, less than a month before Nicor

implemented the PBR, Nicor entered into a transaction in which it sold its DSS inventory to IMD.

As per the contract, Nicor agreed to sell 19.8 bcf of DSS gas to IMD at $2.20 per Mcf. Pursuant to that agreement, Nicor released all of its DSS transportation and storage rights to IMD. The sales price of $2.20 per Mcf was less than Nicor's book value of the DSS inventory. The parties acknowledged that the DSS sale agreement was part of a "larger overall management agreement" they were negotiating. Nicor agreed to "burn and repurchase" 2.8 Bcf of inventory from IMD in that same month at the same price of $2.20 per Mcf. Of the remaining DSS inventory, Nicor agreed to repurchase 15.5 Bcf from January through April 2000 at prices established in the agreement.

Beyond these basic factual details, the background and larger context of the DSS transactions is heavily disputed. It is undisputed that at least one motivation for the transaction was to "remove high-cost LIFO layers before the PBR took effect." The Commission argues this was the sole motivation; Defendants counter that it was just one of many benefits.

More importantly for the purposes of this motion is that Defendants' individual involvement in the DSS transaction is heavily disputed. Defendant Halloran argues that she had no involvement in the transaction; the Commission

counters that she was CFO at the time and that therefore her signature was on the 10-k forms covering the period the transaction.  Additionally, the Commission asserts that Halloran was indeed involved in many discussions about the timing of the DSS transaction.  The timing of those discussions is said to be tied directly to the start of the PBR.

On or about December 8, 1999, Nicor executives, including Defendant Behrens, attended a meeting to discuss the impact of Nicor's sale of DSS gas to IMD prior to the start of the PBR program. The primary purpose of the meeting was to discuss the potential negative impact on ratepayers by selling the inventory in 1999 versus 2000 after the PBR went into effect, and because the gas would be sold at market rates, but below historical costs.

By entering into the DSS transaction before the PBR went into effect, any loss would be, and in fact was, borne entirely by the ratepayers, rather than shared with Nicor.

*The Storage Prefills Transactions*

The Inventory Value Team Report outlined the concept of a potential method to access Nicor's lower cost LIFO inventory—what later came to be known as storage "prefills."  Storage prefills were developed and used to enable Nicor to liquidate its low-cost LIFO layers.

Under the prefill arrangements, Nicor entered into agreements with third parties whereby the third party injected gas into Nicor's storage fields, where it would remain until Nicor decided to purchase the gas. Title remained with the third party until Nicor decided to purchase the gas. Pricing was established at the time of injection and included an agreement for Nicor to pay the cost of funds (i.e., interest). Under the prefill agreements, once the third party injected the gas into Nicor's storage fields, it gave up its rights to withdraw the gas.

The prefill transactions had the following features: (1) gas would actually be stored in Nicor's on-system storage; (2) gas would be accessible to Nicor at some point in the future but the seller retained title to the gas until Nicor purchased the gas; and (3) gas would not be "recognized" as Nicor's inventory. Through the prefill arrangements, Nicor was able to fill its storage fields (an operational necessity) without creating, from an accounting perspective, any new high-cost LIFO layers that would prevent continued access to the remaining low-cost layers.

Nicor has conceded that these transactions were not properly recorded on its books. Specifically, Nicor has conceded that these transactions constituted Product Financing Transactions under FAS 49, and they should have resulted in Nicor recording gas as inventory at the point of injection, not at the point of payment. Plaintiffs claim they were unaware of FAS 49. Nicor's on-site accountants were

aware of the terms and timing of the DSS transactions.

Prefills gave Nicor's management the ability to manipulate Nicor's earnings by allowing Nicor to control the extent to which it liquidated gas storage inventory and accessed low-cost LIFO layers.

Nicor operated at a profit under the PBR in each of the first three quarters of 2000 without resorting to the liquidation of LIFO inventories. Nicor's financial reporting department prepared and transmitted a packet of information to Defendants Halloran and Behrens in their role as members of Nicor's Financial Policy Committee. The packet contained a document that discussed the income Nicor would record from the PBR plan. The document presented PBR income in two categories: (1) income resulting from the "Actual Performance Versus the Benchmark;" and (2) income resulting from the "Impact of Potential Permanent Inventory Reduction." For 2000, the document recommended no adjustment based on "conservatism and our present intent to avoid a permanent inventory reduction." However, during the fourth quarter 2000, Nicor experienced losses relative to the PBR.

For 2000, Nicor had an income target of $10 million for the PBR plan. On December 1, 2000, various Nicor executives, including Defendant Behrens and Jeffrey Metz, met to "discuss critical issues for PBR management in December."

Among the agenda items were "PBR performance target[s]," "Inventory decrement target[s]," and "IMD pre-fill inventory purchase[s]."

On Saturday, December 30, 2000 Behrens was involved to some extent in a meeting to discuss the PBR losses Nicor had incurred during the fourth quarter. Nicor ultimately reported PBR earnings of $12 million, or $2 million over the target amount.

In contrast, during the 4th quarter of 2001, Nicor, for the first time that year, experienced significant earnings in its actual PBR performance. Nicor purchased prefill gas at the end of December. This purchase had the effect of increasing Nicor's costs under the PBR program by approximately $21 million and thereby bringing its reported PBR earnings in line with the company's targets.

Shortly after the year-end results for 2001, Nicor's Gas Supply accounting area prepared a "Final Buckets Analysis" which was transmitted to several of Nicor's senior executives including Defendant Behrens. That document broke PBR income for the year into two categories: (1) "PBR performance without Decrement;" and (2) "Decrement Value." This document means that Defendant Behrens knew that the majority of income that Nicor reported as PBR income for the years ended 2000 and 2001, and for the interim quarters, resulted from LIFO inventory liquidations.

A substantial portion of Nicor's reported PBR income for the years 2000 and 2001 were the result of LIFO liquidations. Defendant Halloran reviewed and signed Nicor's 2000 and 2001 Forms 10-K and its Forms 10-Q for 2001 as Executive Vice President, Finance and Administration, Principal Financial Officer, and Principal Accounting Officer. Behrens along with other member of Nicor's Financial Policy Committee reviewed and approved Nicor's financial reports.

After the press releases of July, 2002, on August 14, 2002, pursuant to the Commission's June 27, 2002 Order which required officers of certain public companies to certify the accuracy of their Commission filings, Halloran certified on Form 8-K that Nicor's 2001 annual and quarterly filings with the Commission contained no untrue statement or omission of material fact.

*Weather Insurance Transactions*

In August 2000, Nicor purchased weather insurance from Aquila covering 2001. Weather insurance is typically entered into by natural gas transmission and distribution companies to shield shareholders from the volatility in earnings that can occur as a result of changes in weather (since gas sales and profits are generally lower in years with warmer winters and vice versa). Nicor agreed with Aquila to pay part of the weather insurance premium in cash and to pay part of the premium in the form of discounted gas sales to Aquila. Nicor sold the discounted

gas to Aquila in March and April 2001 and included the loss on the below-market gas sale to Aquila in the Company's recoverable gas costs under the PGA, effectively recovering from ratepayers a portion of Nicor's weather insurance premium. Whether Nicor's arrangement with Aquila is better conceived as a single transaction or a series of transactions is disputed.

The purpose of the weather insurance policy was to benefit Nicor's shareholders by reducing earnings volatility resulting from unpredicted weather variance. The Proceeds from any payout under the policy would go to the company – not the ratepayers. The benefits and risks related to weather insurance accrued 100 percent to Nicor's shareholders. For example, in 2000, Nicor received insurance payments under its weather insurance policy, but did not share any of the payments with its ratepayers.

**STANDARD OF REVIEW**

Summary judgment is appropriate where the evidence "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party. *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986).

Rule 56(a) expressly allows summary judgment on part of a claim or defense. Courts have held that a particular remedy is a part of a claim on which summary judgment may be granted. *See Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 306-09 (E.D.N.Y. 2010).

## DISCUSSION

*The Counts in the SEC's Amended Complaint*

Count I alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and the Commission's Rule 10b-5. 15 U.S.C. 78j(b); 17 C.F.R. § 240.10b-5. Count II alleges violations of Section 17(a)(1) of the Securities Act of 1933. 15 U.S.C. § 77q(a)(1). Count III alleges violations of Sections 17(a)(2) and (3) of the same. 15 U.S.C. § 77q(a)(2)-(3). Count IV asserts aiding and abetting liability under Section 13(a) of the Securities Exchange Act. 15 U.S.C. §78m(a) and the associated Rule 12b-20, 13a-1 and 13a-13. 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors.

Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state any material fact necessary in order to make a statement made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, [all three] in connection with the purchase or sale of any security.

To establish liability under § 10(b) and Rule 10b-5, the Commission must prove: (1) that Defendants made a material misrepresentation or omission by the use of the mails or other instrument of interstate commerce; (2) that Defendants made a statement or omission with scienter; and (3) that the conduct occurred in connection with the purchase or sale of a security. *SEC v. Gorsek*, 222 F. Supp. 2d 1112, 1114 (C.D. Ill. 2002) (citing *SEC v. First Jersey Securities, Inc., 101 F.3d 1450* (2nd Cir. 1996)).

Section 17(a) states:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

The elements of a § 17(a) violation are similar to those of § 10(b) and Rule 10b-5 except the conduct must be made in connection with the offer to sell or sale of securities and scienter is not required for §§ 17(a)(2) & (a)(3). *Gorsek*, 222 F. Supp. 2d at 1114 (citing *Aaron v. SEC*, 446 U.S. 680, 696 (1980)).

Section 13(a) of the Securities Exchange Act and the relevant Rules promulgated thereunder require the filing of financial statements that (1) are prepared in conformity with GAAP; and (2) contain a report by an independent auditor certifying that the auditor had audited the company's financial statements, in accordance with [generally accepted auditing standards (GAAS)], to determine whether the statements were prepared in conformity with GAAP. Ponce v. S.E.C., 345 F.3d 722, 734-35 (9th Cir. 2003). Further, such reports must be "not misleading." *Id.*

In order to find that Defendants aided and abetted Nicor's violations of Section 13(a) and its corresponding Rules, the Commission must show that (1) Nicor violated the relevant securities laws; (2) Defendants had knowledge of the primary violation and of his or her own role in furthering it; and (3) Defendant provided substantial assistance in the primary violation. *Id.* at 737; *see also SEC v.*

*Mozilo*, 2010 U.S. Dist. LEXIS 98203; *67-*68 (C.D. Cal. Sept. 16, 2010) (citing *Ponce*, 345 F.3d at 737).

*Plaintiff Has Produced Sufficient Evidence of Scienter*

Under Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act, the SEC must establish that Defendants made the alleged misstatements and omissions with "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud," or at a minimum, deliberate or conscious recklessness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

Recklessness in this context means "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (quotation omitted). "This looks like two criteria-- knowledge of the risk and how big the risk is--but as a practical matter it is only one because knowledge is inferable from gravity." *Id.* When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk. *Id.*

Appellate courts often point out that "[i]t is rarely appropriate on summary judgment for a district court to make a finding on state of mind," *McGreal v. Ostrov*, 368 F.3d 657, 677 (7th Cir. 2004), though this is "not always true." *Lyttle*,

538 F.3d at 603.

In broad strokes, Defendants do not contest many of the flaws in Nicor's accounting methods and financial reporting. What they contest is their own role in the creation and submission of those filings. Defendants argue in many points that they were not sufficiently involved in the accounting to warrant individual liability. To the extent they concede involvement in the creation of the reporting, they argue that they disclosed all relevant facts and reasonably relied on their on-site auditors in making the reports.

The Commission has produced sufficient evidence to withstand summary judgment regarding the individual Defendants' involvement. Defendant Behrens was Vice President and Controller for Nicor and Nicor Gas from 1998 through 1999, Vice President Administration for Nicor and Nicor Gas from 1999 through 2000, and Vice President Administration and Treasurer for Nicor and Nicor Gas from 2000 through at least March 1, 2003. In those positions, Behrens was either directly responsible for critical decisions or at least present and engaged in critical decision-making moments. For instance, Jeffrey Metz, who was Nicor's controller in 2000, essentially states that he created the Inventory Value Team on direct orders from Behrens. It was the IVT that created the entire concept of liquidating low-cost LIFO layers while keeping those liquidations less-than-fully disclosed.

26

Behrens was also part of the Financial Policy Committee that approved of the IVT's plan and submission to the ICC that led to the approved PBR. Finally, Behrens was a recipient of the August 4, 2000 memorandum by Metz in which Metz stated that Nicor must be careful not to "highlight the LIFO benefit."

Defendant Behrens also had some role – the extent of which is disputed – in the three transactions that the Commission argues were structured to manipulate earnings under the PBR. Those transactions were the DSS sale, the storage prefills, and the weather insurance. With regard to the DSS sale, Behrens again does not dispute that the transaction was inappropriately accounted for. What Behrens contends is that the accounting method at issue – FAS 49 – is so arcane and technical as to show that he could not possibly have acted with the requisite *scienter*.

There are two problems with Behrens' argument on this point. The first is that Behrens admitted in his response to a request to admit that he did not seek advice from anyone at Arthur Andersen regarding accounting for the DSS transaction (or, in fact, the LIFO liquidation plans or the storage prefill transactions). The second problem is that the obviousness of the improper accounting is vigorously disputed and therefore not susceptible to summary judgment.

Defendant Halloran's involvement in the alleged scheme was arguably more robust than Behrens.'  Like Behrens' Halloran was part of the Financial Policy Committee that approved of the IVT's plan for liquidating the LIFO layers.  But Halloran's involvement in the securities allegations at the heart of the Commission's case goes further because, as CFO, she was directly responsible for Nicor's financial reporting.

Defendant Halloran disputes in general terms the Commission's allegations that Nicor was supposed to "highlight" the LIFO liquidations in its 10-Qs and 10-Ks.  Those forms were adequate, says Halloran, in light of supporting documents that showed inventory decrements to the lower-cost LIFO layers.   The Commission counters that Staff Accounting Bulletin Topic 11F required Nicor to do more, particularly to disclose not just the decrement but the amount of income realized by such decrement.  Halloran had no meaningful reply to this argument, except to emphasize that the treatment of LIFO inventory was a topic she broached with on-site auditors.  What's missing is any evidence that she discussed the earnings that resulted from these decrements with the auditors.  This lack of discussion may or may not amount to negligence, recklessness, or deliberateness, but under the circumstances of this case it suffices for the Commission to survive summary judgment.

There is an important overarching consideration here. With the evidence viewed in the light most favorable to the Commission, a disparate and various series of transactions and accounting statements all had the effect of manipulating earnings under the PBR and shielding those manipulations in the requisite public filings. Any single one of these instances may be ignored or may be viewed as an insufficient indicator of scienter. However, it is long settled that a "magnitude of reporting errors lend weight to allegations of recklessness where defendants were in a position to detect the errors." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997). Defendants expressly acknowledge the improper accounting for the DSS transaction. Defendants have no response for the application of Topic 11F with regard to the LIFO earnings, which Topic apparently applied to nearly three years' worth of financial reports, totaling eleven distinct filings. At some point, there are just too many so-called honest mistakes for Defendants to receive the kind of benefit of the doubt that would allow them summary judgment. This is not to say that the Commission's evidence establishes liability, just that there is sufficient evidence to require the consideration of a jury.

*Civil Penalties Are No Longer Available*

In my memorandum opinion and order of May 13, 2008, I dismissed Defendant Behrens outright from any claims for civil penalties. I also held that as

to Defendant Halloran, the five-year statute of limitations embodied in 28 U.S.C. § 2462 operated to bar the Commission's use of conduct dating from before July 19, 2002 in their case for civil penalties.

Therefore the case for civil penalties can only be founded on the August 14, 2002 filings, a Form 8-K and a Form 10-Q for the second quarter of 2002. Specifically, the Commission argues that these filings ratified the earlier allegedly misleading financials from 1999 through 2001. The Commission's argument is unconvincing.

Halloran's certification ratified the prior financial disclosures, but made express exceptions for any corrections or supplements contained in subsequent reports. Those subsequent reports, in turn, contained the following disclosures: (i) the existence of accounting irregularities; (ii) the initiation of multiple investigations by various governmental agencies into Nicor's accounting related to the PBR; (iii) the appointment of a Special Committee of independent, non-management directors to conduct an inquiry; (iv) the initiation of an informal inquiry by the SEC itself; and (v) the possibility that Nicor's prior financial statements would require restatement as a result of these issues. Further, Nicor issued a press release the previous month, July 2002, which summarized these same facts and announced the Special Committee's appointment of a former

United States Attorney to conduct an investigation into the accounting regularities.

Curative statements and disclosures such as these render the prior statements immaterial as a matter of law. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3rd Cir. 2000). The Commission argues that the *Semerenko* court was speaking of reliance, not materiality, which is not an element of an SEC action. But a review of *Semerenko* indicates an extensive discussion of materiality, not an offhand comment. I find the discussion persuasive, and find that the curative statements issued here were similar to those in *Semerenko*. Indeed, the disclosure in that case was but a single paragraph, while in this case there were multiple statements and advance press releases.

The August 14, 2002 statements were not misleading as ratifications of prior misleading statements. To the contrary, they were accompanied by clearly curative statements warning of the problems from 1999 through early 2002. Therefore, summary judgment is granted as to all claims for civil penalties.

*Injunctions Against Future Violations and the Director/Officer Bars*

The Commission filed the operative complaint in this case on February 25, 2008. The conduct alleged in the complaint ran through late 2002. In the amended complaint, the Commission was adamant that Halloran and Behrens "unless restrained and enjoined by this Court, will continue to engage in transactions, acts,

practices, and courses of business" that would violate the securities laws.  It has been over four years since the Commission made that statement, and nearly ten years since the conduct alleged in this case ended and the investigation into it began.  In that time, the Commission has failed to produce sufficient evidence such that a reasonable court could find any basis for the injunctive relief and director/officer bars.

In order to win an injunction order, the Commission would ultimately have to establish a reasonable likelihood of future violations.  *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982).

> In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation, including such factors as the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transaction; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations.

*United States v. Kaun*, 827 F.2d 1144, 1149-1150 (7th Cir. 1987).

Similarly, in determining whether to order the director/officer bar, a court may consider: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender's status; (3) the defendant's "role" or position when he engaged in the fraud; (4) the defendant's degree

of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *SEC v. Black*, 2008 U.S. Dist. LEXIS 75812, *70-71 (N.D. Ill. Sept. 24, 2008) (quotations and citations omitted).

Here, the Commission has staked its claim for these two equitable remedies on the alleged scope of the fraud and Defendants' level of scienter. But even assuming the Commission's most sweeping allegations about the fraud, including an assumption that the entire scheme was wholly deliberate, no reasonable jurist could order an injunction and director and officer bar in this case. This is because there is no evidence to support a significant number of the relevant factors. For instance, regarding the current occupations of Defendants, Behrens is now employed by a privately held company rather than a publicly held one. The Commission offers only rank speculation that he could at some point return to a public company that would issue the kind of financial statements that form the heart of the alleged wrongdoing here. Further, the Commission has put forth no evidence that Behrens has ever done anything comparable before or since the Nicor fraud.

So, too, with Halloran, although in her case she has retired from her

working life altogether. It is also uncontested that she has no plans to begin working again. In an argument that can, at best, be described as a shortfall, the Commission says that an injunction and a director/officer bar are necessary for her because Halloran "is only 59 years old and certainly could seek to re-enter the workforce." True enough, but this is speculation unsupported by evidence. And on top of that speculation one would have to further speculate that in her (hypothesized) working life she would be reasonably likely to offend again. This is far too little to support the kind of remedy the Commission seeks.

Finally, the Commission has not offered any argument or evidence regarding the gravity of the harm or the Defendants' economic stake in the scheme. Such evidence may or may not exist, but it is not the court's job to go looking for it when the Commission fails to address it in their briefs.

No reasonable court could conclude that there is a reasonable likelihood of future violations in this case. The motion for summary judgment as it relates to the equitable remedies of injunction and director/officer bar is therefore GRANTED. *See Hamblin* 717 F. Supp. 2d at 306-09 (E.D.N.Y. 2010) (supporting summary adjudication of remedies under Rule 56).

CONCLUSION

Defendants' motion for summary judgment is GRANTED as it relates to claims for civil penalties, injunctions, and an officer/director bar. In all other respects, it is DENIED. The case proceeds on all the currently pending counts, but is limited to the remedy of disgorgement.

ENTER:

James B. Zagel
United States District Judge

DATE: August 28, 2012